I'm Karen Landau, and I represent the appellant, Kenneth Taves. I'd like to reserve a minute or two for rebuttal, if I may. Just preliminarily, the briefing in this case was completed before this Court's en banc decision in Ameline. We would be asking for a limited remand under that decision, and I've talked to the Government Council. They do not oppose that. The issues I'd like to address today, however, are the questions of the restitution and the substitute counsel. This case involved a $37.5 million restitution order. The case was prosecuted on two fronts. It began as a civil case, prosecuted by the Federal Trade Commission, and ended in a criminal prosecution. The civil case resulted in a $37.5 million judgment against Mr. Taves, and a receiver was appointed to collect monies for the victims, the credit card holders in this case. At the time of sentencing, the receiver had collected at least $12 million and anticipated the collection of several million dollars more, although they did not anticipate collecting the entire $37.5. The plea agreement in this case provided that Mr. Taves should be credited with monies collected in the civil case. The Government agreed to that. Despite the plea agreement and the evidence presented at sentencing, the district court refused to credit Mr. Taves with the $12 million. And at the time of sentencing, had the government turned any of that money over to the victims? Not yet. It was in the hands of the receiver. And did the government intend to do so? Yes. The receiver was appointed solely to collect monies for victim restitution. I'm not sure this is in the record in front of us. I suspect not. Has the government since turned that money over to victims? I do not know. I cannot answer that question. If the government does turn money over to victims, will that be credited against the restitution order amount? It would appear that it should be under 3664, but it's not clear. I honestly, I can't answer that because it would obviously go back to the district court in the first instance. It seems under 3664 that that would occur, although it's questionable because what 3664 provides for is post, is for monies that are collected post-sentence by a victim in a federal civil or state civil proceeding to be credited against the restitution. The monies have already been collected. So they haven't reached the victims? They haven't been distributed, but they've been collected. So it's, it's, I mean... The monies are to the victims, not to the... That's correct, but that sort of brings us to another part of the problem here, which is that the receiver's expenses are not, one can probably assume that in the civil proceeding the receiver will subtract his expenses and then, you know, once monies start to be distributed, but receiver's expenses are consequential damages that are not recoverable. And under the terms of the plea agreement and the logic of criminal restitution, Mr. Tay should get credit for all the monies seized, because he can't be ordered to pay the rest, he can't be ordered to pay the receiver's expenses under a criminal restitution order under Lameau. Maybe that's his problem, that is to say, he has the misfortune, if that's the right word for it, of having been subjected to both a civil and a criminal proceeding. That may be, except that in the Lameau case, it's a very, very similar situation. In Lameau, there was a receiver, it was again a civil and a criminal proceedings occurred. The victim, which was the sanitary district, not only got criminal restitution ordered, but also got a civil restitution judgment. I mean, a civil, yeah, a civil judgment rather, and a receiver was appointed. And in that case, the district court refused to credit the receiver's expenses against the restitution. In other words, the receiver had recovered, I think, a certain number of millions of dollars. And the district court said, well, I'm going to credit a portion of this, but I'm not going to credit the receiver's expenses. You still owe the receiver's expenses. And this court reversed. And they said, no, that's not appropriate. Why isn't that issue something that can be dealt with if and when it becomes a problem at the time that the victims actually are compensated? Well, but it's a problem now because the receiver already has the money. And the – we don't have – I mean, Mr. Tatis has obviously no control over what the receiver does with the money. In fact, it's questionable – I mean, another thing to point out is, in this case, the probation officer didn't even recommend restitution because there were so many victims for such small amounts of money that it was – it viewed it as impractical. Well, what I'm saying is, so say the restitution order is $37 million. Whatever gets distributed to the – to the victims is going to get credited to Mr. Tatis, I'm assuming, even when the victims get it. And there may be a dispute about deductions made by the receiver, but why can't that be dealt with in a post-judgment proceeding over whether the restitution order has been complied with? In other words, at this point, no victim has actually received any money. So why isn't the – why isn't the $37 million order correct? Well, because at the time of sentencing, the receiver had already recovered $12 million. So it doesn't reflect the facts on the ground at the time of sentencing. But the victims hadn't recovered anything. But the receiver was standing in the shoes of the victims. I mean, that's – that's the point here, I think, is that the receiver – this is not a receiver – this is not comparable to a civil forfeiture case where the government takes the money and may or may not distribute it to the victims at its discretion. But in the statute, does it provide that anyone can stand in the shoes of the victims? The restitution is required to be in the full amount of the victim's loss, regardless of the defendant's circumstances. So I don't understand how, if the money gets to a third party, that counts. Well, that's correct, that restitution is required in the full amount. But the statute also provides for credit – well, I mean, I guess to answer your question, no, the statute doesn't provide that someone stands in the shoes of the victim. The statute doesn't specifically address the question of receivership. But the Lameau case does. And that case is directly on point. But doesn't the Lameau case arise post-judgment, post-sentence in an enforcement proceeding with regard to the – whether the restitution order had been complied with? You know, I don't – I don't believe so, Your Honor, because it was the restitution order made at sentencing. And the Lameau case did not only involve an appeal from that portion of the restitution order, but it involved an appeal from a variety of other matters involving the defendant. The district court in that case actually calculated credits in the – and the circuit just said they were calculated incorrectly. That's correct. Here, the district court refused to calculate a credit. And that's what we're arguing is the abuse of discretion. I mean, if the district court had calculated to argue over the receivership expenses. But the district court refused to calculate any credits at all. And I guess my question – and I'm sorry I'm not making it as clear as I should, but did the district court have to do that at that particular juncture? Or could that not be done downstream in assessing whether the defendant had complied with the order or not? Well, Your Honor, I can't cite you a case that says the district court had to do that. But the district court is supposed to impose sentence, including restitution, based on the situation at the time. I mean, I wouldn't expect the district court to calculate any speculative credits off in the future about some money that they may or may not have recovered from a Vanuatu checking account. But the fact is, is at the time, the receiver was in court and said, yes, we've collected $12 million. Counsel, you have about a minute. I know, Your Honor. I've used up my time. Just quickly, I'd like to discuss the issue of the substitution of counsel. This – Mr. Tavis is the attorney with whom he had a complete breakdown of relationships – relationship. And I have to say, this is somewhat unusual, because here the – the breakdown seems to have happened on counsel's end. Usually, we see defendants coming in and they are asking for counsel to be relieved. Here, counsel repeatedly has to be relieved. By the time of sentencing, the attorney made clear that he would not meet with Mr. Tavis, he would not talk to him on the phone, he would not send his paralegal to meet with him. He was only willing to communicate with him in writing, and apparently that not much. Under these circumstances, the district court did abuse its discretion in refusing to substitute counsel. I have so little time, I would like to – if you have any questions, I'd like to address them. I don't want to – I think we don't. Okay. All right, Your Honor. Then I'll reserve my 45 seconds. Thank you. Ms. Erickson? May it please the Court, Ilana Artson on behalf of the United States. Let me briefly address the restitution issue first. Sorry, could I interrupt? I noticed Mr. Whittlesley was the trial attorney. In the past, I've seen him argue his own cases on appeal. Is there some reason why he's not? The trial attorney is no longer in the criminal division in the U.S. Attorney's Office, so I'm a member of the criminal division and I stepped in. Okay. First of all, let me just confirm that the government agrees that an aniline remand is appropriate here because we can't determine on this record what the district court would have done in an advisory system. Defense counsel correctly points out that the plea agreement here did provide that the parties agree that payments made by or on behalf of defendants to the Federal Trade Commission with respect to the commission's money judgment would be credited to his restitution obligation. However, the district court was not bound by that stipulation. And on appeal, the parties are permitted to argue that the district court's findings are not error. So I would say that the defendant's interpretation is an interpretation that is consistent with the facts to the extent that she marshaled facts to support the idea that the receiver was standing in the shoes of the victims. On the other hand... Can I ask you this? Does the government, does the Federal Trade Commission, or maybe I should say more broadly, does the government intend to turn this money over to the victims so that it will be credited against the restitution order amount? Your Honor, I spoke with counsel for the FTC last week, and what I was advised is that the FTC is still in the process of attempting to repay trade approximately $8 million worth of funds. And when that is completed, they do intend, and I think they usually do this through some kind of third-party contractor, to identify all of the victims and to present some sort of redress plan to return that money to the victims that can be identified. And then what? That is to say, will that money then be credited against the restitution order? I would think that under 3664J2, that would be the appropriate procedure, that the statute provides that any money that a victim has recovered will be reduced from that, the restitution amount. So in no circumstance will he ever be required to pay twice? Correct. The purpose of this statute, as this Court has interpreted, is to prevent double recovery. At this point, there is no double recovery. Certainly there shouldn't be a double recovery, and 3664J2 would require some kind of reduction to the extent that a double recovery would occur. But the government would submit that the District Court did not err on these facts in determining that, as a factual matter, the offset was premature because at the time of sentencing, and indeed as of today, no victim had, as of yet, recovered any loss. I may be borrowing trouble from tomorrow when I have plenty for today, but what happens if, as it may turn out, the government has trouble locating the actual victims? These are small amounts. These are credit cards. I gather their charges are somewhere around $30, as many of them. And the government simply can't pay out more than a couple million dollars. Then what? In all honesty, I don't know the answer to your question. In the civil proceeding, my understanding is that the Court's order recognizes that there may be money left over, and that money can go to the Treasury, and the FTC may have some discretion to do that. And what happens then to the restitution order? The money then owing under the restitution order, they tried to find the victims, they couldn't, and they kept it. Now he's faced with a restitution order that's reduced only by the amount given to the actual victims, and it's now his obligation to find the victims the government couldn't? I think that issue would probably have to be litigated as to whether 3664J2 should require an offset in those circumstances. And that's obviously not in front of us today. It isn't. And with respect to Lomau, I don't think that case is on all fours. I think the problem is we fall somewhere in between. Because the situation in Lomau was that the District Court had ordered restitution to be paid to the receiver. And the government's argument was, well, really it's the rate payers, not the Sanitation District, who are the victims. And this Court said, no, in this case the Sanitation District actually was defrauded. The Sanitation District itself was a victim, so if the Sanitation District has received that money, there needs to be an offset. In our case, the FTC is not a victim. The FTC is supposed to, according to the restitution order in this case, the money is supposed to be paid to the victims of the offense through the receiver. So the receiver is a conduit. The receiver is not the victim. And in that sense, we are not entirely in the same situation as Lomau. What about the receiver's fees, though? Is it appropriate under Ninth Circuit law to charge the receiver's fees to the defendant? Under Lomau, it is not. In the civil case, those fees would still appropriately be deducted, but not in the criminal case. So what I'm hearing is that ultimately, perhaps the District Court is going to have to do pretty much what the defendant is arguing it should have done at sentencing, but it wasn't erroneous for the District Court to defer the decision. Essentially, the government's position is that the District Court didn't err in determining that it was premature to make the offset at this point, and the defendant had the burden to prove the offset, and it was premature at this point. And may have to make exactly that offset later on. That very well may be the case. Your remarks are that it obtains $8 million more, as you were saying the government was trying to do. So the offset may be greater than what the defendant is asking for today. It may be, if that money is repatriated. Turning to the substitution issue, I would first point out that in this case, the defendant never requested to substitute counsel. Really, the issue is whether the District Court abused its discretion in denying the request of defense counsel to withdraw, and there are two specific occasions that counsel attacks here. In evaluating both the adequacy of the inquiry and whether there was a complete breakdown of communication, this Court has to look at the entire course of conduct over three and a half years, from the time of plea until the ultimate time of sentencing. Those two events in October of 2003 and February 2004 have to be viewed in terms of the totality of the inquiry and whether there was a breakdown in terms of the relationship that this defendant had had, both with his prior counsel, whom the Court relieved, and with current counsel. With respect to the inquiry, I would point out that in George and Smith, this Court noted that the District Court is not required to, on every occasion, conduct an inquiry when the defendant makes repetitive complaints against counsel that either have already previously been addressed or essentially, as the District Court determined here, are made for the purposes of delay. And that is what the record shows here, because we see that over the course of a year and a half from the time of the plea until the time of the first, it's almost a year and a half, there's a constant dispute from the first sentencing date that was continued and continued and continued over whether the defendant is going to move to withdraw his plea or whether he's going to try to escape the stipulation in his plea agreement as to loss. Ultimately, the District Court relieves Mr. Fersman basically because the District Court and the government sort of agreed to accept his representation that there's a conflict. But the District Court says, I'm not going to let this go on, and I'm not going to let you create this conflict with the next counsel. So what happens? The next counsel comes aboard, and at the very first conference in February of 2003, we have the same problem. Mr. Bachman says, well, my client wants to escape this stipulation, and we're going to see if we can work with the government to try to modify the plea agreement. That effort proceeds. The government is not amenable to a modification. In July of 2003, there's a motion by counsel to basically ask the court unilaterally to modify the plea agreement. The District Court denies that. And the events that the defense focuses on happen after this point, after the District Court has ruled two years after the guilty plea, no, you may not escape from your plea agreement stipulations unless you want to withdraw your plea. And if you don't want to withdraw your plea, then this is your plea agreement. So what we see happening at that point is the defendant essentially refuses to accept the court's ruling. And in October of 2003, defense counsel comes forward and says, I need to withdraw because my client and I can't agree what to do. He doesn't want to abide by this stipulation. And the District Court says, counsel, that's your decision. That's a tactical decision. You don't need your client's authorization. Go forward. It's resolved. He also says, I want to withdraw because he's so abusive. I can't stand being in the same room with him. Not at that point. Not in October of 2003. That comes later. And with respect to the inquiry, because that October 2003 hearing is the one where counsel spoke and indicated that there was this tactical disagreement and defendant was not allowed to speak. So there the focus is on whether there was an inquiry. And the government's response is, well, really there didn't need to be an inquiry at that point because there had been two years of inquiry before that. And then at the next hearing, which is in October of 2004, the defendant is given an opportunity to speak and says, I want to continue working with this counsel and I understand that I'm stuck. The final problem happens in February of 2004 when essentially defense counsel says, you know, he's filed a complaint against me and I don't consider this to be tenable. What I would point out there is, again, there is not a complete breakdown. Defendant did not ask for his counsel to be withdrawn. He said, you know, the defendant said, I will dismiss this state bar proceeding. I didn't realize it was going to be such a problem. I sent this letter before our last status conference and I'm sorry, I would have withdrawn it, but it was already in the mail. This is at ER 131-143. He says, when we communicate, we get something accomplished. I like counsel. Again, what is the problem the defendant has? He has two problems. One, he wants to go ahead with this loss hearing. And two, he's upset because his counsel doesn't come to see him when he comes to see other clients. Over the course of the hearing, the district court resolved both of these problems. The district court explained to the defendant, look, your expectations are unreasonable. Your counsel can't come and see you every time he's at the Metropolitan Detention Center. He has other cases. He has other clients. He can't see you. He can't be your umbilical cord, which is the term the defendant used, if there's nothing happening in your case. And with respect to the second issue, you know, again, the court said, I told you we're not having a loss hearing. You may have heard that at some prior hearing and you may have had this false hope. And the defendant said, I understand. I've been going on a false hope. I understand we're going forward. Could you wrap up here a couple of minutes? So again, this is a case in which there was a difficult client. There had already been one substitution. The lines of communication were still open. There was not an irreparable breakdown at sentencing. The defendant received effective representation, and he communicated three times during the course of his allocution with his attorney. I would submit that there was no abuse of discretion in denying the substitution. Thank you, counsel. Ms. Landau, you have some rebuttal time. Your Honor, on the question whether Mr. Toews wanted substitution, I want to point out, the district court began these hearings by saying things like, you're either going to be sentenced with Mr. Backman or pro se. So before he ever heard from Mr. Toews, including in the last hearing at the end of February, he had already told — what he said effectively had a chilling effect. Mr. Toews never wanted to represent himself. Any defendant who hears something like that is going to be, oh, I better shape up. But here we did have a complete breakdown. These are the kinds of things that Mr. Backman said about his client. I might as well go ahead and conclude my representation, because I know a 2255 is coming down the pike. He said things like, the man is abusive. I'm sorry, but Mr. Backman's idea of abusiveness, it's a little thin. You know, Mr. Toews, what he identified as abusive on Mr. Toews' part was Mr. Toews referring to himself, Mr. Toews, using a racial epithet. I don't know most criminal defense lawyers would think that abusive. He was not the easiest client. There's no question about that. But that does not mean that he has to go forward with proceeding with an attorney that's not willing to work with him. The district court, you know, I understand the district court appears to have been quite frustrated with Mr. Toews. But the district court started off these hearings saying things like, and this is from the beginning, when he was considering whether to relieve Mr. Firstman or not, you know, I don't really think you have a conflict. I think you're doing this for delay, all sorts of things. I have to say the district court appears to have prejudged this in some respects. And certainly that comes through very strongly when in the later hearings, as I pointed out in my briefing, the judge first didn't let Mr. Toews speak, then prefaced his remarks by expressing his belief that Mr. Backman was not going to be relieved no matter what, almost practically ordered Mr. Toews to withdraw the state bar complaint. Again, this was not an easy client. Many of our clients, I represent criminal defendants myself, many of them are not easy. Some of them require more attention than others. And sometimes there has to be a substitution of counsel. This was one of those cases. Thank you, counsel. Thank you. The case just argued is submitted. We appreciate a very good argument by both counsel. That brings us
judges: Graber, W. Fletcher, Fogel